NOT FOR PUBLICATION                              [Docket No. 1]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

EVAN KARATHANSIS, et al.

                Appellants,

      v.

THCR/LP CORPORATION, et al.,

              Appellees.

Civil No. 06-1591(RMB)

**OPINION**

APPEARANCES:

Jerrold S. Kulback, Esquire
John Vena Fiorella, Esquire
Archer & Greiner, PC
One Centennial Square
East Euclid Avenue
Haddonfield, New Jersey 08033
(856) 795-2121
    Attorneys for Appellants

James V. Kearney, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, New York 10022-4802
(212) 906-1200
    Attorney for Appellees

Robert A. Klyman, Esquire
Latham & Watkins, LLP
633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
    Attorney for Appellees

Charles A. Stanziale, Jr., Esquire
Jeffrey T. Testa, Esquire
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center

100 Mulberry Street
Newark, New Jersey 07102-4079
(973) 565-2051
     Attorneys for Appellees

**BUMB**, United States District Judge:

<u>Introduction</u>

     This case involves an appeal from the Bankruptcy Court's Order of March 3, 2006.  There are two issues presented in this appeal.  The first issue is whether the Bankruptcy Court erred in interpreting the Debtor's Plan of reorganization.  The second issue is whether the Bankruptcy Court erred in concluding, as a matter of law, that the Appellants, former stockholders of the Debtor, were not entitled to distributions under the confirmed Plan because they elected to sell their shares in the open market after the record date but prior to the ex-dividend date.

     This Court finds that the Bankruptcy Court properly interpreted the Plan of reorganization.  This Court disagrees, however, with the conclusion that the Appellants lost their right to the Plan's distribution package when they sold their shares. The Plan clearly entitled them to the distributions, regardless of whether or not they sold their shares.  Accordingly, for the reasons set forth more specifically below, this Court will reverse the Bankruptcy Court's Order of March 3, 2006, and remand for further proceedings consistent with this Opinion.[1]

---

[1] While this Court requested additional briefing on certain issues, pursuant to the parties' submissions and this Court's

A.    The Parties

The appellants, Evan Karathanasis, Anna Maria T. Ciminello, Alan C. Pilla, Daniel A. Amicucci, Dominick D'Apice, Emanuel Ciminello, III, Emanuel Ciminello, Jr., Maryanne Carotenuto, Salvatore Ciminello, Thomas Ciminello, Joel Freidburg, Joel H. Friedman, IME Partnership Plan f.b.o. Joel Friedman, Sebastian Pignatello, Chris Reslock, Phillip & Doris Sternberg and Michael & Andrea D. Yacyk, Jr., (the "Appellants") are a group of shareholders who previously held shares of Trump Hotels & Casino Resorts, Inc. (the "THCR" or the "Debtor").[2]

On November 21, 2004, THCR and certain of its affiliates filed voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Appellants, holders of the Debtor's stock ("Old THCR Common Stock"), held claims against the Debtor.  The Debtor's distributions to the holders of these claims is the heart of this case.

B.    The Second Amended Plan of Reorganization

On March 30, 2005, the Debtor filed a Second Amended Joint

---

Opinion, those issues are not relevant to the instant resolution of the appeal and will not be discussed here.

[2] There appears to be a dispute as to whether or not all of the Appellants are former shareholders of the Debtor.  Because the parties agree that at least one of the Appellants formerly owned stock, this Court will not, indeed, need not address this issue.  (Appellees Br. at 19 n. 4).  It also appears that the Bankruptcy Court assumed the Appellants were all former shareholders.  (PA 0336).

Plan of Reorganization (the "Plan").  The Plan set forth the
distributions to be made to the various classes of claimants upon
the Plan's effective date.  In relevant part, Section 3.04(k) of
the Plan created an impaired Class 11.  Class 11 claims consisted
primarily of the  "beneficial owners" of Old THCR Common Stock.
In the event Class 11 voted to accept the Plan, the Plan provided
for an agreed upon distribution to each holder of an "Allowed
Class 11 Interest."

As the Plan itself stated, this agreed upon distribution was
consented to among the TAC Noteholder Committee (the ad hoc
committee of certain holders of secured notes issued by Trump
Atlantic City Associates), the TCH Noteholder Committee (the ad
hoc committee of certain holders of secured notes issued by Trump
Casino Holdings, LLC), and Donald J. Trump.

In relevant part, section 3.04(k) of the Plan provided for
the following treatment:

> *Treatment*.  In the event Class 11 votes to accept the
> Plan, the TAC Noteholder Committee, the TCH Noteholder
> Committee, and DJT have consented to the following
> distribution.  On the Effective Date (or, in the case
> of the World's Fair Sale Proceeds, as soon as
> practicable), each holder of an Allowed Class 11
> Interest shall:
>
>     (i) to the extent such holder holds Old THCR
> Common Stock, retain its existing shares of Old THCR
> Common Stock, subject to the Reverse Stock Split and
> dilution upon issuance of the New Common Stock;
>
>     **(ii) to the extent such holder held Old THCR
> Shares as of the New Class Warrants Record Date, March
> 28, 2005 (originally February 9, 2005), receive, on a**

4

**Pro Rata basis, (a) New Class A Warrants, (b) the World's Fair Sale Proceeds, and (c) the Class 11 Cash Payment;**

(iii) to the extent such holder holds Old THCR Holdings LP Interests, retain its existing Old THCR Holdings LP Interests, subject to the terms of the New THCR Partnership Agreement; and

(iv) to the extent such holder holds Old THCR Class B Common Stock, retain its existing shares of Old THCR Class B common Stock, which will be reclassified on a one-time basis into shares of new Class B Common Stock.  The ability of holders of New Class B Common Stock to vote shares of New Common Stock issuable upon the exchange of New THCR LP Interests will be adjusted to account for the Reverse Stock Split.

§ 3.04(k).

*Voting*.  Class 11 is Impaired and the holders of Allowed Old THCR Common Stock Equivalents in Class 11 are entitled to vote to accept or reject the Plan.

(PA-0040)(emphasis added).[3]

Thus, as of the effective date of the Plan, a current holder of shares would be entitled to receive one new share in the reorganized company for every 1000 old shares owned.  A holder who held shares <u>as of the record date</u>, (discussed further below), would be entitled to receive warrants, a cash payment per share, and a pro rata share of the net proceeds from the sale of the World's Fair site.  (§ 3.04(k)(ii)).

i.  <u>Record Date</u>

On April 5, 2005, the United States Bankruptcy Court

---

[3]    "PA" refers to the exhibits appended to the Appellants motion.

5

conducted the confirmation hearing regarding the Plan.  Pursuant to the terms of the Plan, the timing of the record date was a subject of the hearing.  A record date is the date upon which a distribution based on the plan terms is to be made.[4]  The original New Class A Warrants Record Date (the "Record Date") was February 9, 2005.  During the April 5, 2005, confirmation hearing, the Debtor and others agreed to change the Record Date to March 28, 2005.  Counsel for the Equity Committee explained the rationale for the change as follows:

> After consulting with a number of the constituencies in this case, it seems appropriate to move that record date to something closer to the confirmation date.  And let me tell you what we're concerned about.  <u>As currently drafted, the holder of the common stock as of February 9 is entitled to distribution.  That would mean people that sold the stock between February 9 [the Record Date] and today [April 5], both receive the proceeds from the sale of the stock and would be entitled to the distribution</u>.  We think that might come as a surprise to some of the people who bought the stock in the ensuing period.[5]
>
> We proposed and the debtor has acquiesced to moving the [Record Date] to March 28th. [] We don't believe this is a substantive change in any way.  <u>It's just marking which of the stockholders receive the distribution</u>.

(PA 0091)(emphasis added).

---

[4] Pursuant to the Uniform Practice Code ("UPC") the record date is defined as "the date fixed by the...issuer for the purpose of determining the holders of equity securities...entitled to receive dividends...or any other distributions."  UPC Rule 11120(e) (PA 0361).

[5] In this appeal, the Debtor argues to the contrary, stating that the purchasers of the Old THCR stock knew what they were buying.

No party, including the Debtor, objected.  The Bankruptcy
Court approved the change of the Record Date from February 9,
2005 to March 28, 2005, and entered an Amended Confirmation Order
on April 11, 2005.

On May 11, 2005, the Debtor filed a motion to change the
Record Date yet again to May 20, 2005, the Effective Date of the
Plan.  The Debtor filed this motion because, as it informed the
Bankruptcy Court, there was "possible market confusion regarding
the impact of the Record Date on the Plan's distributions for
holders of Old THCR Shares."  (PA 0139).

The Bankruptcy Court denied the Debtor's motion.  In
relevant part, the Bankruptcy Court found that it would not
change the Record Date because reliance had been placed on the
Record Date as it was set, i.e., the date of March 28, 2005.  The
court opined:

> "I think the exposure is as great on those who sold
> with a reliance on the record date as it was set in
> Court, and in the confirmation order, and of record,
> and disseminated to the public. [] And if there was a
> misunderstanding or mistaking, one or the other or
> both, among those 8 to 10 million purchases of shares,
> so be it. ...[T]he reliance that was validly placed by
> those who held shares at that time can now ([sic]-not)
> be reversed.  I'm convinced that it cannot."

(PA 0154).

The Debtor did not appeal the Bankruptcy Court's Order denying
the request to make the record date the same as the effective
date of the Plan.

ii.  Appellants' Sale of Shares After Record Date/Before
Plan's Effective Date

Subsequent to the Record Date, March 28, 2005, but before
the Effective Date of the Plan, May 20, 2005, the Appellants sold
their Old THCR Common Stock.  (PA 0169).[6]  Following the
Effective Date of the Plan, May 20, 2005, the Debtor made
distributions pursuant to the Plan through their disbursing
agent, Continental Stock Transfer & Trust Company
("Continental").  Continental made distributions to the "record
owner" of the Old THCR Common Stock as of the Record Date, the
Depository Trust Company ("DTC").[7]  DTC subsequently made
distributions of the warrants and cash payments[8] to the
beneficial owners of the Old THCR Common Stock as of the

---

[6]      As stated in the Bankruptcy Court's Opinion:

[t]he movants herein are a group of 17 former owners of
Old THCR Common Stock, who were beneficial owners as of
March 28, 2005, but who sold their stock between the
March 28th Record Date and the May 20th Effective Date.
The movants contend that as Class 11 'beneficial
owners' who held Old THCR Common Stock as of the Record
Date, they were entitled to receive the distribution
provided under the plan, notwithstanding the fact that
they each sold their shares on the open market prior to
the plan's Effective Date.  (Bankruptcy Opinion at 8;
(PA 0341)).

[7]      As the Bankruptcy Court noted, DTC served as a
"clearing house, holding shares on behalf of various banks,
brokers, firms and their funds, who in turn hold those shares for
their participants." (PA 0344).

[8]      The third part of the distribution package, the
proceeds from the sale of the World's Fair Site, apparently, have
not yet been distributed.  See Appellant's Br. at 7, n.4.

8

Effective Date, not the Record Date.  Consequently, the
Appellants - who had previously sold their shares - did not
receive these distributions.

Appellants sought relief from the Bankruptcy Court to
enforce the Plan pursuant to its plain terms and order the Debtor
to make distributions to them.  Appellants argued, inter alia,
that because they were the "beneficial owners" of the Old THCR
Common Stock as of the Record Date, the Plan clearly and
unambiguously entitled them to distributions.  The Debtor
objected and argued that any rights to the Plan distributions
that the beneficial holders may have had were controlled by the
rules of the National Association of Securities Dealers
("NASD")[9], specifically NASD Uniform Practice Code Section 11140
("UPC Rule 11140").

The Debtor argued that the application of UPC Rule 11140
resulted in the Appellants' forfeiture of any distribution rights
under the Plan once they sold their stock.  Under the UPC, the

---

[9]     The NASD is authorized by the Securities & Exchange
Commission to adopt and administer the Uniform Practice Code, the
rules and regulations governing over-the-counter secondary market
securities transactions.  The UPC governs how distributions by
security issuers must be allocated to the holders of securities.
Bankruptcy Opinion, at 15.  UPC Rule 11140 provides:

In respect to cash dividends or distributions, stock
dividends and/or splits, and the distribution of
warrants, which are 25% or greater of the value of the
subject security, the ex-dividend date shall be the
first business day following the payable date.
(PA 0362).

proper recipient of a distribution is determined by reference to two dates, the "record date" and the "ex-dividend date." (DA 23-24).[10]  Record date means the "date fixed by...issuer for the purpose of determining the holders of equity securities...entitled to receive dividends...or any other distribution."  UPC Rule 11120(e);(PA 0361).  "Ex-dividend date" means the date established by the NASD pursuant to the UPC on and after which the security is traded without a specific dividend or distribution.  Thus, read in tandem, a holder of a security after the record date but before the ex-date, which would normally be entitled to receive the right to receive the dividend, would lose that right to the buyer.  In other words, the stock, when sold during that period, carries with it the right to receive a distribution, a "due bill," from the seller to the buyer.  (DA 24).[11]  After the ex-date, the stock price would be adjusted downward to reflect the dividend distribution.  In short, the UPC Rule established which holder of the shares was entitled to the dividend or distribution, the holder on the Record Date or the holder on the ex-dividend date, here, May 23, 2005 (the next business day after the Effective Date of the Plan).  In this

---

[10]     DA refers to the exhibits appended to Appellees' Brief.

[11]     The impact of this ruling is "to prevent undue [sic] enrichment...they settle with the ultimate beneficial holder." (PA 0250) (Comment of Allen C. Wang, Esquire, counsel for Debtor).

case, whoever owned the shares as of May 23, 2005, was entitled to the distribution, irrespective of the Record Date pursuant to the UPC Rule.

> iii.  <u>The Bankruptcy Court's Opinion</u>

The Bankruptcy Court held hearings on July 18, 2005, and October 28, 2005.  On February 16, 2006, the Bankruptcy Court denied the Appellants' motion to enforce the Record Date distribution to allow a distribution to be made to the Appellants under Section 3.04 of the Plan.  The Bankruptcy Court concluded that when the Appellants sold their shares after the Record Date, they voluntarily entered into the securities marketplace and "subjected them[selves] to the rules of that marketplace. [They] caused the sale not only of [their] shares of stock...but also the distribution package otherwise attaching to the Old THCR Common Stock[.]"  Bankruptcy Opinion at 14;(PA 0347).

On April 4, 2006, Appellants appealed from the Bankruptcy Order.  On appeal, the Appellants argue:

1) that Section 3.04(k)(i) plainly and unambiguously entitled them to distributions under the Plan;

2) UPC Rule 11140 did not abrogate their contractual rights under the Plan;

3) the equities favor the Appellants because they relied upon the plain language of the Plan.

On the other side, the Appellees contend that the Bankruptcy

11

Court did not abuse its discretion in holding that the distribution, as it occurred, complied with the unambiguous terms of the Plan, especially in consideration of Plan Section 8.02 read in tandem with Section 3.04.  Moreover, Appellees argue that the Bankruptcy Court correctly held that securities regulations govern the distribution.  Finally, Appellees urge this Court to ignore Appellants' plea for equitable relief as Appellants did not seek said relief in the Bankruptcy Court and, even if they had, because they would not be entitled to such relief.

C.   Standard of Appellate Review

A bankruptcy court's interpretation of a plan of reorganization is reviewed for abuse discretion.  First Western SBLC v. MAC-TAV, 231 B.R. 878, 883-84 (D.N.J. 1999), aff'd without op., 213 F.3d 628 (3d Cir. 2000).  "In reviewing a bankruptcy court's interpretation of a confirmed plan...the reviewing court should extend that interpretation the same deference that is otherwise paid to a court's interpretation of its own order."  In re O'Connor, 258 F.3d 392, 401 (5th Cir. 2001).  See also In re Weber, 25 F.3d 413, 416 (7th Cir. 1994); In re Terex Corp., 984 F.2d 170, 172 (6th Cir. 1993).

An appellate review of a bankruptcy court's factual findings is performed under a "clearly erroneous" standard.  In re F/S Anlease II, Inc., 844 F.2d 99, 103 (3d Cir. 1988); IRS v. Pransky, 261 B.R. 380, 384 (D.N.J. 2001).  Finally, a district

court has plenary review over legal questions.  In re Trans World Airlines, Inc., 145 F.3d 124, 131 (3d Cir. 1998); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981).

The Court reviews the record before the Bankruptcy Court against these legal principles.

i.  Interpretation of the Plan of Reorganization

The first issue presented in this appeal is the interpretation of Section 3.04(k)(ii) of the Plan.  A confirmed plan of reorganization "acts like a contract that is binding on all of the parties, debtor and creditors alike."  First Union Commercial Corp. V. Nelson, Mullins, Riley & Scarborough, 81 F.3d 1310, 1317 (4th Cir. 1996).  A court should not look beyond the terms of the contract if its terms are plain and unambiguous. See Montblanc-Simplo GmbH v. Aurora Due S.r.L., 363 F. Supp. 2d 467, 475 (E.D.N.Y. 2005) ("[w]here the contract's terms are unambiguous, the Court may not go beyond the face of the contract in interpreting the contract's meaning."); see also Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.), 147 B.R. 855, 862 (Bankr. S.D.N.Y. 1992) ("[t]he parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.").

Here, Section 3.04(k)(ii) clearly provided that the beneficial holders of OLD THCR who held stock as of March 28, 2005 (the Record Date), were entitled to receive the distributions provided for in Section 3.04(k)(ii).  Indeed, the Bankruptcy Court so held that Section 3.04(k)(ii) was clear on its face.  See Bankruptcy Opinion at 13; (PA-346)(the "plan clearly provides that to the extent that beneficial owners of Old THCR Common Stock held such stock 'as of the New Class A Warrants Records Date, i.e., March 28, 2005,' they were entitled to receive the distribution package promised Class 11 holders under the plan.").[12]  The Bankruptcy Court correctly found that the Plan was plain and unambiguous.  The Plan clearly stated that the Appellants were entitled to the distributions set forth in section 3.04(k)(ii).

The Debtor contends, as it later did before the Bankruptcy Court, that the distributions under the Plan were only to be made to the "record" holders, not the appellants who were "beneficial" owners of Old THCR Common Stock.  The Debtor points to section 8.02(b)(iii) of the Plan which authorized the Debtor's disbursing agent to deal only with those holders of record as of the close of business on the Distribution Record Date:

_____

[12] During a July 18, 2005 hearing regarding the Record Date Motion, the Bankruptcy Court stated that "the plan says what it says;" the Court had to "take the plan as it was confirmed and be guided accordingly".  PA 0263.

(iii) Distribution Record Date

The Disbursing Agent and the respective agents of the
Debtors will have no obligation to recognize the transfer of
the TAC Notes, TCH First Stock, TCH Second Priority Notes,
Old TCHR Common Stock, Old THCR Class B Common Stock and Old
THCR Holdings interest occurring after the Distribution
Record Date, and will be entitled for all purposes relating
to the Plan to recognize and deal only with those holders of
record as of the close of business on the Distribution
Record Date.

Plan at § 802(b)(iii) (PA 0060).

This Court finds, as did the Bankruptcy Court, that the

Debtor's attempts to hide behind this provision fail.[13]  It is

clear from the plain meaning of the Plan that the distribution

was intended to reach the actual beneficial holders.  The Plan

clearly states:

Distributions under the Plan shall be made by the
Debtors...for the benefit of the holders of...Allowed
Administrative Claims and Allowed Claims and Allowed
Interests in the Debtor's respective books and records.

Section 8.02(b)(iii); (PA 0060).

Moreover, as counsel for the Debtor conceded at oral argument in

_____

[13]  Specifically, the Bankruptcy Court stated:

Here, the distribution from the debtor's
disbursing agent to DTC was intended to ultimately
reach the actual beneficial holders.  The debtor's
attempt to focus on the distribution between
record holders and beneficial holders to contend
that the [Appellants] were not entitled to direct
distribution under the plan because they were not
the records holders of Old THCR Common Stock must
fail.

Bankruptcy Opinion at 12; PA 0345.

front of the Bankruptcy Court, the Debtor was obliged to instruct its disbursing agent to make distributions according to the terms of the Plan.  (PA 0235).

Accordingly, pursuant to the plain and unambiguous terms of the Plan, Appellants (assuming they were record holders of Old THCR Common Stock as of March 28, 2005), were entitled to distributions by the Debtor of: a) new Class A Warrants, b) the World's Fair Sale Proceeds, and c) the Class II Cash Payment upon the Plan's Effective Date. [14]

When a contract is plain on its face, the Court need not look beyond its four corners to determine the intent of the parties.  Nonetheless, it is clear that the parties understood that the Plan, as drafted, afforded the Appellants the opportunity to receive the Plan's distribution and the proceeds from the sale of the stock.  See April 5, 2005, confirmation hearing comments of Mr. Merola, Counsel for the Equity Committee: ("As currently drafted, the holder of the common stock as of February 9 [the original record date] ...[who] sold the stock between February 9 and today, both receive the proceeds from the sale of the stock and would be entitled to the distribution."). (PA 0091).   Moreover, the Debtor acknowledged the same

---

[14]     Appellees argue that Section 3.04 must be read in conjunction with Section 8.02 which provides that distributions only to the record holders - which, in this case is DTC.   See Appellees Br at 18.   This argument fails for the reasons articulated by the Bankruptcy Court.   See n. 13 supra.

interpretation when it filed its motion on May 12, 2005, to
modify the Record Date and establish it as the same date as the
Effective Date, May 20, 2005.  As the Debtor's supporting
Memorandum stated: "[the establishment of the Record Date as the
Effective Date] should avoid any unjust enrichment based on the
sale of Old THCR shares since [the original Record Date]."  (PA
0139).

Additionally, at the hearing to establish the Record Date as
of the Effective Date, Debtor's counsel informed the Bankruptcy
Court that it was attempting "to avoid...a situation where
shareholders and creditors get an opportunity to double dip and
get a recovery based on their shares and a recovery that should
go to somebody else based on who holds the shares as of the later
point in time when the plan goes effective."  May 18, 2005,
Transcript at 3-4 (PA 0148-149).

Moreover, counsel for the TAC Noteholders Committee
described the current state of affairs on May 18, 2005:

> it just seem[s] to be an unusual situation where buyers,
> after the record date, were paying basically...essentially
> full price for the stock - - but they would get, <u>pursuant to
> the plan</u>, very, very little - - a tiny, tiny distribution,
> whereas <u>sellers who sold during this period 'in reliance of
> the record date' would not only get the lion's share of the
> distribution, but of course got the sale price as well</u>.

<u>Id.</u> at 9-10 (PA 0154-155)(emphasis added).

Although the Debtor argued to the Bankruptcy Court that its
request for a modification of the Plan's Record Date was

"technical", id. at 3, it is clear that the Debtor itself
understood that the Plan's plain and unambiguous terms allowed
the holder of Old THCR Common Stock to receive the distributions
set forth in Section 3.04 of the Plan and the sale proceeds.
Indeed, the Bankruptcy Court queried how the Debtor could "change
the rules after they've been set," id. at 14 (PA 0159), and
expressed concern that "there indeed could be serious detriment
to those who relied on the March 28th date to make decisions
about what they would do." Id. at 6 (PA 0151).  Thus, the
Bankruptcy Court properly denied Debtor's motion.[15]

It is interesting to note that when the Appellants moved
before the Bankruptcy Court for an order enforcing the record
date and directing the Debtor to make the Plan distributions to
them, the Debtor accused the Appellants of attempting "to get a
double recovery...in contravention of the Plan."  See Debtor's
Objection, (PA 0205) (emphasis added).  But this "double recovery
scenario" is exactly how the Debtor, itself, had interpreted the
Plan earlier when it sought, unsuccessfully, to move the Record
Date.  See PA 0091, 0139, 0148-49, & 0154-55 discussed supra.

_____

[15]     The parties alerted the Bankruptcy Court to the
possibility of having 8 to 10 million purchasers "end up in [her]
court" because they were expecting the distribution, but did not
get it.  See id. at 8 (PA 0153).  Of course, that concern became
moot by operation of UPC Rule 11140.  This concern by the Debtor
illustrates, however, that the parties clearly understood that
the unambiguous terms of the Plan established the rights of the
distribution to go to the Appellants.

This tack by the Debtor is astonishing.[16]  In a reversal of how it had earlier interpreted Section 3.04 of the Plan, the Debtor for the first time, before the Bankruptcy Court, relied on Section 8.02(b)(iii) of the Plan and argued that it was only required to make distributions to "holders of record" and not the beneficial holders.  However, the Debtor acknowledged, as it must, that it had an obligation to properly advise the holders of record to disburse in accordance with the Plan.  Id. at 10 (PA 0235).

In this Court's view, the Debtor's later opposition to the Appellants' motion was a sophistic attempt to reconstrue the plain meaning of Section 3.04.  In other words, having lost its request to move the Record Date to May 20, 2005, to avoid the result that the Debtor feared, that Appellants would be paid twice per the terms of the Plan, the Debtor switched course in front of the Bankruptcy Court and assumed an alternative argument - - the Plan did not provide for a double recovery because of Section 8.02's application.  This revisionist argument is without merit.  While the provisions of a contract must be read together, as the Debtor urges, Section 8.02(b)(iii)'s provisions are the procedural mechanism by which the distributions are to be

---

[16]    The Bankruptcy Court similarly found it "perplexing." See July 18, 2005, Transcript, at 4-5, & 7 (PA 0229-30 & 0232)("I'm perplexed frankly at the debtor's position" "I'm shocked...").  Obviously, this theory was a change sprung on the Bankruptcy Court.

19

achieved; they do not trump the entitlements bestowed by section Section 3.04.  Read together, as this Court must do, they state, roughly, "3.04 is what you're entitled to receive and 8.02 is how we will go about distributing that entitlement."[17]

    ii. <u>Impact of NASD Rules</u>

The second issue on appeal is whether the Bankruptcy Court erred in holding that the Appellants' sale of their Old THCR Common Stock between the Record Date and the Effective Date "defeated the opportunity [by operation of the NASD rules] to receive the plan distribution to which they would have otherwise been entitled" (PA 0347), an argument that confronted the Bankruptcy Court at a late stage of the game once the Debtor revised its strategy.  This Court finds that the Bankruptcy Court erred as a matter of law.[18]

_____

[17] The language used to incorporate 8.02 into 3.04, in fact, supports this conclusion: "The <u>timing and procedures</u> for all distributions specified in this section [3.04] are governed by Section 8.02(Methods for Distributions Under the Plan)." (PA 031-40)(emphasis added).

[18] Appellants argue that this is an issue of law to be determined under the standard of plenary review.  Appellees contend that the application of UPC 11140 should be reviewed under the abuse of discretion standard. "An abuse of discretion involves 'a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" <u>In re Lan Assocs. XI, L.P.</u>, 237 B.R. 49, 54 (D.N.J. 1998) (citations omitted).  This Court notes that even under the heightened standard, the decision of the Bankruptcy Court was incorrect as its decision regarding that operation of UPC 11140 as to trump the confirmed Plan constitutes an errant conclusion of law.

As discussed above, a confirmed plan of reorganization is a contract binding on all parties, including the debtor and creditors.  <u>First Union Commercial Corp.</u>, 81 F.3d at 1317.  <u>See also</u>, <u>In re Varat Enters., Inc.</u>, 81 F.3d 1310, 1317 (4th Cir. 1996) ("[u]nder the Bankruptcy Code, a confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike.").  A confirmation order constitutes a final judgment on the merits with respect to the issues addressed in the plan.  <u>Eastern Minerals & Chems. Co. v. Mahan</u>, 225 F.3d 330, at 336 n.11 (3d Cir. 2000) (stating that "we recognize that an order confirming a chapter 11 plan is a final order 'on the merits'").  As a final judgment on the merits, a confirmation order bars a party from relitigating provisions of a plan, even those which violate the Bankruptcy Code.  <u>Stoll v. Gottlieb</u>, 305 U.S. 165 (1938).

A confirmation order also bars parties from relitigating provisions of a plan that violate non-bankruptcy law.  <u>See</u>, <u>e.g.</u>, <u>In re Bowen</u>, 174 B.R. 840, 847 (S.D. Ga. 1994) ("the binding effect of a confirmed plan of reorganization is such that <u>res judicata</u> applies even when the plan contains provisions which are arguably contrary to applicable law...[c]onsequently, challenges to a confirmed plan of reorganization which allege that the plan is contrary to applicable law, either bankruptcy or otherwise, are bound to be unsuccessful."); <u>In re Howe</u>, 913 F.2d 1138, 1143

(5th Cir. 1990)(stating that it "is well settled that a plan is binding upon all parties once it is confirmed and that all questions that could have been raised pertaining to such plan are res judicata.").

Although the Bankruptcy Court found that the Appellants subjected themselves to the guidelines set by NASD, this Court finds that the Appellants are nonetheless still entitled to the Plan distributions under Section 3.04(k)(ii) notwithstanding UPC Rule 11140.  The Bankruptcy Court was concerned, justifiably so, that the Plan, as written and confirmed, permitted the shareholders to receive the distribution and the proceeds of the sale of the stock.[19]  Believing that the court could not permit this scenario under federal securities regulations, the court denied the Appellants' motion.  In essence, the Bankruptcy Court found that Section 3.04 was contrary to applicable federal securities regulations.[20]

---

[19]    The Debtors also felt this way prior to their current position.  See PA 91, 139, 148-49, & 154-55 discussed supra.

[20]    Indeed, when surprised by this, the Bankruptcy Court questioned why this conflict of laws was not dealt with in the Plan.  The court stated at oral argument:

    And if it's illegal to offer to beneficial owners of
    record as of a certain date the opportunity to rely on
    that date and do whatever they wanted to do with their
    shares of stock after that date in anticipation that
    they would still receive that distribution as of that
    date, if that's illegal then I would have thought that
    the plan would have provided for that, that the plan
    would have anticipated NASDAQ's requirements and the

The interpretation of the Plan and the application of UPC
Rule 11140, however, can be read in harmony, contrary to the
Bankruptcy Court's holding.  Indeed, at oral argument, this Court
questioned whether or not the Plan and UPC 11140 could be read in
harmony, without violating the plain terms of Section 3.04 and
the application of UPC 11140.  Debtor's counsel replied:

> "then two things happen, Your Honor.  The debtor pays twice
> and the movant gets paid the value of the distribution twice
> and that was certainly not the benefit of the bargain."

January 26, 2007, Transcript at 72-73.

Interestingly, this was the <u>same</u> concern that the Debtor
expressed to the Bankruptcy Court when it tried to move the
Record Date but was not successful, suggesting that this was
indeed the benefit to the shareholders contemplated if the Record
Date preceded the Effective Date.  When the Plan's terms and UPC
Rule 11140 are read together, the Appellants recover twice, just
as the Debtor predicted, but fought to prevent.  Accordingly,
having found that the terms of Section 3.04 were plain and
unambiguous, this Court holds that it was in error for the

---

applicable regulations or statutes that would proscribe
that kind of provision and that would have either said,
you can't sell.  If you're a shareholder, you can't
double dip.  You've got to hold onto that until the
effective date of the plan, number one, or the
effective date is the record date for purposes of
distribution.  If you hold those shares on May 20th or
whenever we're going to close on this, then you'll be
entitled to shares.  But, that's not what the plan said
and that's what's disturbing about this whole scenario.

23

Bankruptcy Court to deny the Appellants their Section 3.04(k)(ii)
distributions because they sold their shares after the Record
Date but before the Effective Date.  There is nothing in the Plan
that provided that the Appellants could not receive the
distributions and sell their shares.  Indeed, as discussed above,
the parties anticipated that result in the absence of a change of
the Record Date and the Bankruptcy Court appropriately questioned
as to why the Plan did not prohibit the "double dip" payment.
See PA 0256, discussed supra n.19.  Although this Court
recognizes that the net effect of this holding is that the Debtor
may have to pay twice, that issue is not presently before it.

Accordingly, this Court holds that the Bankruptcy Court
erred as a matter of law in holding that the Appellants lost
their right to the distributions set forth in the Plan when they
sold their shares subsequent to the Record Date and prior to the
Effective Date.

D.  Unjust Enrichment

Throughout this appeal, and before the Bankruptcy Court, the
Debtor argued that the Appellants would be unjustly enriched if
either court were to hold as this Court does now.[21]  Because this

---

[21]    This Court notes that the Appellants agree that they
may be only entitled to the Section 3.04 distribution less the
proceeds from the sale of the stock.  See Appellants Br. at 19
(stating that the Debtors must at least be ordered "to pay the
Appellants the value of the distribution package, minus the
amount that the Appellants received from the sale of their
stock.").

issue of unjust enrichment was not fully developed before the Bankruptcy Court, this Court will remand for further proceedings on this issue.  See Insurance Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1118 (3d Cir. 1995) ("[w]e have consistently deferred to the fact-finding duties of the bankruptcy court and have held that where sufficient facts have not been developed by that court, the proper response is to remand.").

Conclusion

In conclusion, this Court holds that the plain and unambiguous language of the Plan entitles Appellants to the distributions promulgated thereunder.  The Bankruptcy court erred as a matter of law when it ruled that the operation of UPC 11140 superceded the rights of Appellant to the Plan distributions.  Thus, the decision of the Bankruptcy court is reversed and this case is remanded for further proceedings consistent with this Opinion.

An accompanying Order will issue this date.


Dated: April 25, 2007              s/Renée Marie Bumb
                                   RENÉE MARIE BUMB
                                   United States District Judge